UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, ) ) ) | |
| Plaintiff, ) | Case No. 20-cv-6199 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| TONY'S FINER FOODS ENTERPRISES, INC., TONY'S FINER FOODS NO. 6, INC., TONY'S FINER FOODS NO. 9, INC., and CHARLENE FIGUEROA, individually and on behalf of all others similarly situated, ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

### MEMORANDUM OPINION AND ORDER

This case involves insurance coverage for a claim in state court under the Illinois Biometric Information Privacy Act ("BIPA") against a grocery store chain known as Tony's. The insurer, State Automobile Mutual Insurance Company, filed suit for a declaratory judgment about its duty to defend. State Automobile later moved for summary judgment.

For the reasons stated below, State Automobile's motion for summary judgment is hereby denied.

### Background

Tony's is a family-owned and family-operated grocery store chain with 16 locations in Chicagoland. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 28). This case involves three relatives in the corporate family: (1) Tony's Finer Foods Enterprises, Inc., (2) Tony's Finer Foods No. 6, Inc., and (3) Tony's Finer Foods No. 9, Inc. (collectively, "Tony's").

In December 2018, Charlene Figueroa, a former employee, filed suit against Tony's in state court under the Biometric Information Privacy Act ("BIPA"). *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 18, 22 (Dckt. No. 26); State Ct. Cplt., at ¶¶ 103–04 (Dckt. No. 1-4); Igraffia Decl., at ¶ 3 (Dckt. No. 27-1); *see also* 740 ILCS 14/1. She worked for Tony's from March 2017 to September 2018. *See* State Ct. Cplt., at ¶ 48.

According to the state court complaint, Tony's takes the fingerprints of each employee that it hires. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 26); State Ct. Cplt., at ¶ 37 (Dckt. No. 1-4). Employees use their fingerprints to clock in and out of work. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 22; State Ct. Cplt., at ¶ 38. That practice, according to Figueroa, violates BIPA.

Tony's received service of process on January 8, 2019, and filed an appearance within a week. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 19–20 (Dckt. No. 26).

Tony's notified its insurance broker, Assurance Agency, of the existence of the *Figueroa* lawsuit. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 28). Assurance responded that "all applicable insurance carriers would be provided with notice." *Id.*; *see also* Igraffia Decl., at ¶ 5 (Dckt. No. 27-1).

The parties don't reveal when, exactly, Tony's notified its broker. But it was sometime between January 2019 (when Tony's received service of process) and March 2019 (when Assurance started giving notice to insurers).

Tony's had purchased a number of insurance policies over the years. One of the policies was a commercial general liability insurance policy from State Automobile. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 26). The policy ran for one year, starting in March

2013, and Tony's renewed it twice. So Tony's had coverage from March 2013 through March 2016. *Id.*

But Assurance Agency did not provide notice to State Automobile about the state court lawsuit against Tony's, at least not right away (in 2019). Maybe it figured that there was no coverage under a policy covering 2013 to 2016 for claims by an employee who joined in *2017*. Or maybe it thought that there was no coverage for BIPA. Or maybe it was an oversight.

The parties don't reveal the backstory. The key point is that Tony's told the insurance broker about the state court lawsuit, and the broker *didn't* give notice to State Automobile (again, at least not right away, in 2019).

Instead, in March 2019, Assurance provided notice to one or more insurance carriers for Tony's under *different* policies. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 28). (As an aside, the parties don't reveal how many other carriers there were, or who they were. The Court simply knows that Assurance notified one or more insurance companies under *other* policies.) Specifically, those policies included (1) a general liability insurance policy for 2017–18; (2) employment practices liability policies (plural) for 2018–20; and (3) cyber liability insurance policies for 2018–20. *Id.*; *see also* Igraffia Decl., at ¶ 5 (Dckt. No. 27-1).

In June 2019, Tony's filed a motion to dismiss the state court case, arguing that it was barred by BIPA's statute of limitations. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 9, 11. (Dckt. No. 28). In December 2019, the Illinois court denied the motion to dismiss. *Id.* at ¶¶ 12–13.

Not much happened in the state court case for the next three months. But in March 2020, the state court stayed the case to await a decision in a related BIPA case in an Illinois appellate court. *Id.* at ¶ 14; Igraffia Decl., at ¶ 9 (Dckt. No. 27-1); Stay Order (Dckt. No. 27-6).

In March 2020, an Illinois appellate court issued its decision in *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2020 IL App. (1st) 191834, 445 Ill. Dec. 388, 166 N.E.3d 818 (2020). That holding clarified the landscape of coverage for BIPA claims. The court held, in relevant part, that providing fingerprinting data to third parties is a form of "publication" within the meaning of a general liability policy. *Id.* at 826–27. As a result, the insurer in that case had a duty to defend the employer who took the fingerprints. *Id.* at 830.

In June 2020, Tony's got wind of the decision, and asked its broker about it. The *Figueroa* lawsuit covered the same issues as *West Bend*. So, presumably, Tony's wanted to make sure that its general liability providers knew about the underlying action, and explore the possibility of a duty to defend. Assurance, in turn, said that it would report the underlying action to any other general liability providers. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 28).

On September 8, 2020, Tony's tendered its defense in the underlying action to State Automobile. The insurer accepted the tender from that date forward subject to a reservation of rights. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 7 (Dckt. No. 26). Putting that date in perspective, State Automobile received notice in September 2020, meaning 20 months after Tony's received service of process in January 2019.

State Automobile responded by filing the case at hand, advancing six counts. *See* Cplt. (Dckt. No. 1). Five counts request a declaratory judgment that it does not have a duty to defend Tony's in the underlying action in state court. *Id.* at ¶¶ 10–35. The other count requests reimbursement for any defense costs incurred. *Id.* at ¶¶ 36–39.

As an aside, one of the unexplained mysteries in the filings is why a policy that ran from 2013 to 2016 could cover claims by an employee who joined the company in *2017*. Maybe it has

4

something to do with the fact that Figueroa brought a class action. That is, maybe the proposed class and class period include claims by members from 2016 or earlier. Another possibility is that it has something to do with BIPA's retention schedule provision, which has a look-back period of three years from the company's last contact with the employee. And here, Figueroa left the company in 2018, so the three year period stretches back to 2015.

But the parties don't tell that part of the story. It's not clear why a policy from 2013 to 2016 would cover an employee who joined in 2017. Who knows. The key point is that State Automobile is not arguing that a policy covering 2013 to 2016 cannot apply to an employee who joined the company in 2017 because she joined after the end of the policy period. It's not an issue in the motion, so the Court will put it to the side.

Turning back to the story, the state court continued a start-and-stop approach. Seven months later, in October 2020, the state court lifted the stay, but it didn't last long. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 28). Four months later, in February 2021, the state court stayed the case for a second time. It put the case on ice because a related case is currently before the Illinois Supreme Court. *Id.* at ¶ 16; Igraffia Decl., at ¶ 10 (Dckt. No. 27-1); Order Staying Litigation and Duty to Answer (Dckt. No. 27-8).

The state court has stayed the case twice, and the second stay remains in effect. Or, at the very least, the parties have not notified this Court that the stay was lifted.

Since service of process in January 2019, the state case has been stayed much of the time. The case was stayed from March 2020 to October 2020 (*i.e.*, seven months), and again from February 2021 to the present (*i.e.*, thirteen months). That's roughly 20 out of 39 months – about half the time.

5

Looking at it from a different angle, the case has been stayed much of the time since the state court denied the motion to dismiss in December 2019 (*i.e.*, 20 months out of the 28 months from December 2019 to March 2022). (The Court is rounding the months, but the point is directionally correct.)

In light of the two stays, the state court case is still in the early stages. In fact, the pleadings aren't even complete. Tony's has not yet filed an answer. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 28). It has not produced discovery, and has not briefed the issue of class certification. *Id.* at ¶¶ 17–18. Tony's also has not settled, or offered to settle, the state court case. *Id.* at ¶ 19.

In the case before this Court, State Automobile moved for summary judgment. It advanced a number of arguments, but since then, some of them have fallen by the wayside. *See* Pl.'s Mtn. for Summ. J. (Dckt. No. 23).

The insurer originally put forward four arguments for summary judgment, but the Illinois Supreme Court's opinion in *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978 (2021), rendered two of them meritless.[1] *See* Pl.'s Mtn. for Leave to Cite New Authorities and Withdraw Certain Prior Arguments, at ¶¶ 1–4 (Dckt. No. 33). State Automobile, in turn, withdrew those two arguments. *Id.* at ¶¶ 5–6.

---

[1] First, State Automobile argued that the commercial general insurance policy did not provide coverage at all because the underlying complaint did not allege that Tony's published any information. *See* Pl.'s Mem. in Support of its Mtn. for Summ. J., at 3–5 (Dckt. No. 23-1). Second, State Automobile claimed that the "recording and distribution of material or information in violation of law exclusion" bars coverage. *Id.* at 8–10. However, in *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978 (2021), the Illinois Supreme Court rejected both arguments. *Id.* at ¶¶ 50, 58–59. So State Automobile withdrew them here.

Two theories remain. State Automobile argues that the employment-related practices exception in the insurance policies excludes coverage. In the alternative, it maintains that there is no coverage because Tony's breached the notice condition.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

"Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (cleaned up). "[A]n insurance policy is a contract, and the same rules of construction that apply to other types of contracts apply to insurance policies." *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc.*, 785 F. Supp. 2d 722, 727 (N.D. Ill. 2011) (Dow, J.) (citing *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 223 Ill. 2d 407, 307 Ill. Dec. 626, 860 N.E.2d 280, 285 (2006)); *see also Scottsdale Ins. Co. v. Columbia Ins. Grp.*, 972 F.3d 915, 919 (7th Cir. 2020).

The "primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement." *Nicor, Inc.*, 860 N.E.2d at 286; *see also Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 305 Ill. Dec. 533, 856 N.E.2d 338, 343 (2006). "If the words used in the policy are unambiguous, they are given their plain, ordinary, and popular meaning." *Country Mut. Ins. Co.*, 856 N.E.2d at 343. "An insurance policy must be construed as a whole, giving effect to every provision." *Id.* at 342–43. "All provisions of the policy should be read together; every part of the contract must be given meaning, so no part is meaningless or surplusage." *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 503 F. Supp. 3d 602, 606 (N.D. Ill. 2020).

"Although insurance policies are construed liberally in favor of coverage, this rule of construction comes into play only when the policy language is ambiguous." *Id.* "Whether an ambiguity exists turns on whether the language in the policy is susceptible of more than one reasonable interpretation." *Archer Daniels Midland Co.*, 785 F. Supp. 2d at 727. The test of ambiguity is what a reasonable person in the position of the insured would understand them to

mean, not what the insurer intended its words to mean. *See Ins. Co. of Illinois v. Markogiannakis*, 188 Ill. App. 3d 643, 136 Ill. Dec. 307, 544 N.E.2d 1082, 1089 (1989).

Under Illinois law, "[t]he insurer bears the burden of establishing that it has no duty to defend," which "includes affirmatively demonstrating the applicability of an exclusion." *Skolnik v. Allied Prop. & Cas. Ins. Co.*, 2015 IL App (1st) 142438, 399 Ill. Dec. 171, 45 N.E.3d 1161, 1167 (2015). "Courts also narrowly read any policy provision that purports to exclude or limit coverage, and apply them only where the terms are clear, definite, and specific." *Id.* (cleaned up).

State Automobile makes two arguments against coverage. The first is about an exclusion, and the second is about notice. The Court will take them up in that order.

## I. The Exclusion for Employment-Related Practices

State Automobile argues that there is no coverage because the state court case falls within an exclusion for employment-related practices. *See* Pl.'s Mem. in Support of its Mtn. for Summ. J., at 5–8 (Dckt. No. 23-1). The parties basically have a dispute about whether a claim under BIPA is a claim about an employment-related practice within the meaning of the policies.

The policies contained an exception that excludes coverage for certain employment-related claims. Specifically:

> This insurance does not apply to:
>
> "Personal and advertising injury" to:
>
> **(1)** A person arising out of any:
>
>     **(a)** Refusal to employ that person;
>
>     **(b)** Termination of that person's employment; or
>
>     **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline,

9

>> defamation, harassment, humiliation, or discrimination directed at that person; . . . .

*See* 2013–2014 Policy, at 181 of 334 (Dckt. No. 1-1); 2014–2015 Policy, at 202 of 333 (Dckt. No. 1-2); 2015–2016 Policy, at 211 of 333 (Dckt. No. 1-3).

Two of the three subparts are not at issue. State Automobile does not argue that the state court case is about a refusal to hire, or a decision to fire, an employee. The only question is whether the state court case is about an injury arising out of "[e]mployment-related practices." *Id.*

The parties do not offer much Illinois case law about the meaning of an exception for employment-related practices. Some of the cases focus on whether the employee was acting within the scope of employment. *See, e.g.*, *W. Bend Mut. Ins. Co. v. Rosemond Exposition Servs., Inc.*, 378 Ill. App. 3d 478, 316 Ill. Dec. 904, 378 N.E.2d 640, 649 (2007) ("[W]e believe that to construe the ERP exclusion's use of the phrase 'employment related' as referring exclusively to matters related to employment performance would unduly limit an otherwise broad and unambiguous term."); *Am. All. Ins. Co. v. 1212 Rest. Grp., LLC*, 342 Ill. App. 3d 500, 276 Ill. Dec. 642, 794 N.E.2d 892, 900 (2003) ("[T]he salient question is whether the alleged defamatory statements were made in the context of Alexander's employment and related to his employment performance."). That's not an issue here.

At first glance, one might think that the exclusion applies to a BIPA case about how employees clock-in and clock-out of work. Tony's had a "practice[]" for recording the time worked by its employees. They had to use their fingers to sign in and sign out. That's a practice, and the exclusion seems to cover practices. So the exclusion seemingly applies.

That reading has some surface appeal. But based on a closer read, the text and structure of the exclusion reveal that it does not extend to claims involving BIPA.

10

Consider, for starters, the architecture of the language. The exclusion comes in three subparts. It applies to claims about (1) a refusal to hire; (2) termination; and (3) a grab-bag of other employment-related conduct.

The first two subparts involve the hiring and firing of employees. They cover the comings and goings of employees. The third subpart, on the other hand, is a basket filled with an assortment of practices. The third subpart includes "[e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person." *See* 2013–2014 Policy, at 181 of 334 (Dckt. No. 1-1); 2014–2015 Policy, at 202 of 333 (Dckt. No. 1-2); 2015–2016 Policy, at 211 of 333 (Dckt. No. 1-3).

That provision does not come out of nowhere. It is the third part of a trilogy, and the first two provisions covered hiring and firing. That context sheds light on the meaning of the third provision. It suggests that the provision applies to an adverse employment action, not any and all claims about something that happens at work. The structure of the language suggests that it requires a change in employment status or other negative treatment directed at the employee.

Neighboring words shed light on the meaning of other words in the neighborhood. *See Illinois State Bar Ass'n Mut. Ins. Co. v. Leighton Legal Grp., LLC*, 2018 IL App (4th) 170548, 422 Ill. Dec. 723, 103 N.E.3d 1087, 1095 (2018) (applying the doctrine of *noscitur a sociis*, or "determin[ing] the meaning of a word by examining the meaning and context of surrounding words," to an insurance contract). You can tell a lot about words, like people, by who they hang out with.

When there is a list, the individual components of the list should be read together. That is, the collection of words helps to inform the meaning of any individual word. *See, e.g.*, *CFTC*

11

*v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550–51 (7th Cir. 2013) ("Under the principle of *noscitur a sociis*, the fact that several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.") (cleaned up); *People v. Perry*, 224 Ill. 2d 312, 309 Ill. Dec. 330, 864 N.E.2d 196, 208–209 (2007) ("[T]he word 'includes' is used to introduce a list of things of value that illustrate the meaning of the general term 'property.'"); *LeCompte v. Zoning Bd. of Appeals for Vill. of Barrington Hills*, 2011 IL App (1st) 100423, 354 Ill. Dec. 869, 958 N.E.2d 1065, 1071 (2011) ("[W]hile the terms in the definition of agriculture that describe the uses for agricultural purposes are not exhaustive, if there are any other terms to be included in the description of uses of the land for agricultural purposes they should be similar to, not different from, as in this case, the listed terms."); *Kostecki by Kostecki v. Pavlis*, 140 Ill. App. 3d, 94 Ill. Dec. 645, 488 N.E.2d 644, (1986) ("Under the statutory construction doctrine of *ejusdem generis*, when general words, such as 'including others' or 'among others,' follow the enumeration of several specific classes of things or persons, the general words will be construed as applying only to things of the same general class as those specifically enumerated. We find no plausible reason why this doctrine should not be applied here, where a specific listing follows a general reference to glazed doors.") (citation omitted).

      The text of the third subpart reinforces the structure, buttressing the same conclusion. The exclusion refers generally to "[e]mployment-related practices, policies, acts or omissions." *See* 2013–2014 Policy, at 181 of 334 (Dckt. No. 1-1); 2014–2015 Policy, at 202 of 333 (Dckt. No. 1-2); 2015–2016 Policy, at 211 of 333 (Dckt. No. 1-3). If the text stopped there, then State Automobile might have the better argument. How to clock-in and clock-out is, strictly speaking, a practice or policy.

But the text doesn't stop there. It continues with a laundry list of targeted actions against an employee. It applies to practices, policies, acts, or omissions "*such as* coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person." *See* 2013–2014 Policy, at 181 of 334 (Dckt. No. 1-1) (emphasis added).

Using one's finger to clock-in and clock-out is an awkward fit in that string, at best. The list gives examples of treating an employee badly, either by taking adverse action against her (*e.g.*, demotion, evaluation, reassignment, discipline), or by mistreating her in some way (*e.g.*, coercion, defamation, harassment, humiliation, or discrimination). Everything in that list suggests a change in an employee's standing, or targeted mistreatment of a specific person – that is, conduct "*directed at* that person." *Id.* (emphasis added).

The thematic consistency suggests the existence of a theme. And the existence of a theme suggests that there is an underlying principle that guides the interpretation and limits the scope of the provision. The existence of a theme is directionally significant.

Scanning a finger is not a disciplinary action, meaning the type of thing that would get the HR Department involved. It does not affect an employee's standing with the company. And it is not mistreatment of a specific employee, either, unlike defamation, harassment, and so on.

Think about it this way. If someone were to add "fingerprinting" to the list, it would stick out like a sore thumb. It is, in some sense, a practice. But it is a categorically different type of practice than everything else in the list. The other items involve mistreatment that is targeted at a specific employee in a direct, personal way. They involve treating a particular person badly. Adding fingerprinting to the list calls to mind the line from a classic Sesame Street tune: "one of these things is not like the others / one of these things just doesn't belong." *See* Sesame Street, One of These Things (Is Not Like the Others) (Columbia Records 1970).

13

True, the list begins with the phrase "such as." And the phrase "such as" is illustrative, not exhaustive. *See Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("As the use of the term 'such as' confirms, the list is illustrative, not exhaustive."); *Enis v. Cont'l Illinois Nat'l Bank & Tr. Co. of Illinois*, 795 F.2d 39, 42 (7th Cir. 1986) ("The words 'include' and 'such as' show that the specific instances are illustrative, not exhaustive.").

The phrase "such as" functions like the word "including." And "including" is not limiting. It introduces a non-exhaustive list of examples. The "word *include* does not ordinarily introduce an exhaustive list." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132, (2012) (emphasis in original); *see also id.* at 226 ("When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well."); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (explaining that "including" "emphasizes the fact that that which is within is meant simply to be illustrative"); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("The text employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not limitative' function of the examples given . . . which thus provide only general guidance . . . ."). "Including" does not mean "including *only*."

So the list is not exhaustive. Still, the list does tell you something. It is full of context clues. The list communicates the kinds of things that are covered. And by implication, the list signals what isn't covered. It doesn't draw the exact boundary line, but it does stake out the terrain and suggest the characteristics of claims that fall outside the scope of coverage. The list is not *exhaustive*, but it is *suggestive*.

Imagine going to a summer picnic for the Fourth of July, where everyone was going to pitch in and bring something. Imagine if you asked your friend to bring "food, such as chips,

14

pretzels, or cheese and crackers." You probably would be surprised if your friend showed up with a Thanksgiving dinner with all the fixings. A whole turkey is food, all right, but not the type of food suggested by the list of examples.

By the same token, imagine if you heard someone say "games, such as football, basketball, and hockey." Poker, charades, and rock-paper-scissors probably wouldn't come to mind. If someone offered you "breakfast, such as Frosted Flakes or Cheerios," you probably wouldn't envision that a Denver omelet was on the menu.

Sometimes, in everyday parlance, people use the term "including" before a list of things that might not be obvious. Or they do so for special emphasis or for clarification. "Following the general term with specifics can serve the function of making doubly sure that the broad (and intended-to-be-broad) general term is taken to include the specifics." *See* Scalia & Garner, *supra*, at 204. Sometimes a specific term follows a general term for belt and suspenders.[2]

For example, imagine an advertisement for a cruise in Miami, saying: "The price covers all expenses, including airfare." In *that* context, no one would think that the term "expenses" is

---

[2] When discussing the *ejusdem generis* canon of construction, the Scalia and Garner treatise observes that it applies when a general term follows a specific term. So, it applies to a sentence like "pigs, cows, horses, and other animals." The meaning of the phrase "other animals" is informed by the preceding list. The Scalia and Garner treatise also notes that that particular canon does not apply to the opposite scenario, that is, when a general term comes before a series of specific terms. *See* Scalia and Garner, *supra*, at 202–05. So, that particular canon would not apply to a sentence about "animals, such as pigs, cows, and horses." As the treatise observes, sometimes a list of specific terms serves a "belt-and-suspenders function." *Id.* at 204. There is a difference between saying that a list of specific terms does not *dictate* or *limit* the meaning of a preceding general term (on the one hand), and saying that a list of specific terms does not *inform* the meaning of a preceding general term (on the other). The list of specific terms may not be *controlling*, but that does not mean that it is not informative. The authors did not take the position that the list of specific terms sheds no light on the meaning of the preceding general term. In fact, the treatise recognizes that in "all contexts other than the pattern of specific-to-general, the proper rule to invoke is the broad associated-words canon, not the narrow *ejusdem generis* canon." *Id.* at 205.

limited to airfare or airfare-related expenses. The purpose of that phraseology is to shed light on what is covered by "all expenses," with no negative inference.

But sometimes the list sends a signal. Consider the following sentence: "Chicago has been blessed with great athletes, such as Walter Payton, Dan Hampton, Mike Singletary, Gale Sayers, and Brian Urlacher." Surely the last winner of the Chicago Marathon is a great athlete, too. But the context clues suggest that the sentence is about football, and that the speaker is celebrating the history of the Chicago Bears.

Under State Automobile's reading, the exclusion would cover just about any and all claims by employees. And if that's the case, one wonders why the text did not take the direct approach. It would have been easy to write an exclusion saying that it does not cover any claims by employees, period. The exclusion could have said: "This insurance does not apply to 'Personal and advertising injury' to [an employee for anything that happens at work]."

But instead, the policy included a list with three subparts. And the third subpart includes a list of examples that share a theme. The crafting of the language suggests that it covers a subset of claims brought by employees.

Other courts in this district have confronted the same issue under policies with the same language. They have come to different conclusions. *Compare Am. Fam. Mut. Ins. Co. v. Caremel, Inc.*, 2022 WL 79868, at *3–4 (N.D. Ill. 2022) (Leinenweber, J.) (holding that a "BIPA violation is of the same nature as the exemplar employment-related practices listed in the Policy"), *with Citizens Ins. Co. of Am. v. Thermoflex Waukegan, LLC*, 2022 WL 602534, at *4–5 (N.D. Ill. 2022) (Kness, J.) (holding that the claims in the lawsuit "do not unambiguously share 'general similitude with . . . the matters specifically enumerated in the employment-related practices exclusion'") (citation omitted).

Using a finger to clock-in and clock-out is a practice or a policy, in a colloquial sense. But it isn't the type of practice or policy envisioned by the full text of the provision. To the extent that there is any ambiguity, the tie goes to the insured. *See United Servs. Auto. Ass'n v. Dare*, 357 Ill. App. 3d 955, 294 Ill. Dec. 258, 830 N.E.2d 670, 678 (2005) ("[I]nsurance policies are to be liberally construed in favor of coverage, and where an ambiguity exists in the insurance contract, it will be resolved in favor of the insured and against the insurer.").

In sum, the Court concludes that the BIPA claims do not fall within the exclusion for employment-related practices.

## II. Notice

The next argument is about notice under the policy. State Automobile contends that Tony's breached the notice condition of the policy, thus severing the duty to defend. *See* Pl.'s Mem. in Support of its Mtn. for Summ. J., at 10–14 (Dckt. No. 23-1).

Under Illinois law, "[t]he timeliness of an insured's notice to its insurer is a question of fact for the trier of fact." *W. Am. Ins. Co. v. Yorkville Nat. Bank*, 238 Ill. 2d 177, 345 Ill. Dec. 445, 939 N.E.2d 288, 293 (2010). "The following factors may be considered in determining whether notice to an insurer has been given within a reasonable time: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *Id.* at 293–94. Here, there is enough evidence to create a genuine issue of material fact about the timeliness of notice, so the decision must go to a jury.

The policy requires Tony's to notify State Automobile "as soon as practicable." *See, e.g.*, 2015–2016 Policy, at 204 of 333 (Dckt. No. 1-3); *see also* Pl.'s Mem. in Support of its Mtn. for

17

Summ. J., at 11 (Dckt. No. 23-1); Defs.' Mem. Opposing Pl.'s Mtn. for Summ. J., at 11 (Dckt. No 30). Under Illinois law, "as soon as practicable" means "within a reasonable time." *Country Mut. Ins. Co.*, 856 N.E.2d at 343. "An insured who knows a suit against it exists but allows a considerable length of time to pass before notifying the insurer does not automatically lose coverage under the insurance policy, even one which includes the 'as soon as practicable' provision . . . . only if the insured's delay in notifying the insurer is justifiable." *N. Ins. Co. of N.Y. v. City of Chicago*, 325 Ill. App. 3d 1086, 259 Ill. Dec. 664, 759 N.E.2d 144, 149 (2001).

Basically, each side puts forward arguments about whether Tony's provided timely notice. The insurer understandably points to the significant passage of time between the date of service of process for the underlying lawsuit (January 2019) and the date when it received notice (September 2020). The parties agree that Tony's received service of the underlying case on January 9, 2019 and then notified State Automobile on September 8, 2020. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 7, 19 (Dckt. No. 26). That's 20 months.

That's a long time. But Tony's points out that the insurer didn't suffer any prejudice from the delay. For most of that time, the underlying case in state court was stayed. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 14–16 (Dckt. No. 28). Nothing happened – no answer, discovery, class certification briefings, or settlement talks. *Id.* at ¶¶ 17–19. And the one motion to dismiss had nothing to do with insurance, focusing only on the statute of limitations. *Id.* at ¶¶ 10–11. So a lot of time passed, but not a lot happened.

State Automobile points to Tony's level of sophistication. Tony's isn't a small, mom-and-pop operation. It is a chain with 16 stores, and has experience with an insurance broker and various insurance policies. *Id.* at ¶¶ 1, 4–5. The familiarity with insurance suggests that Tony's had the sophistication to act promptly.

18

But Tony's points to facts showing (in its view) that it did, in fact, act with diligence. Tony's notified three different insurers almost immediately after Figueroa filed suit. *Id.* at ¶¶ 4–5. Tony's didn't know that State Automobile's insurance might cover this suit until over a year later.

In March 2020, an Illinois court held that a commercial general insurance policy might cover a BIPA claim. *See W. Bend Mut. Ins. Co.*, 166 N.E.3d at 400. Three months later, when Tony's learned about that case, it reached out to its insurance broker. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 21–22 (Dckt. No. 28). State Automobile then received notice of the underlying claim in September. *Id.* at ¶ 7. Taken together, the actual time lapse might be closer to six (or even three) months.

Overall, the facts pull in different directions. The language of the policy, the passage of time, and the sophistication of the insured suggest that Tony's waited too long. But State Automobile did not suffer any apparent harm from the passage of time, so maybe "no harm, no foul" applies. In the end, a jury needs to sort it out and decide whether notice came too late.

## Conclusion

For the foregoing reasons, the Court denies State Automobile's motion for summary judgment.

Date: March 8, 2022

Steven C. Seeger
United States District Judge